# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 13, 2004 Session

## STATE OF TENNESSEE v. PATRICIA WHITE and CRAIG WHITE

### Appeal from the Circuit Court for Gibson County
### Nos. 16216 and 16216-1      L. T. Lafferty, Judge

---

### No. W2003-00751-CCA-R3-CD  - Filed October 15, 2004

---

A Gibson County jury convicted Patricia White of theft of property valued over $10,000, a Class C felony; the trial court sentenced her to a term of four years, suspended, and fifteen years' probation. The same jury also convicted Patricia White's husband, Craig White, of facilitation of theft of property valued over $10,000; the trial court sentenced him to a term of two years suspended, and two years' probation. As a condition of probation, the trial court held the couple jointly liable for $124,000 in restitution. On appeal the defendants contend that the trial evidence is insufficient to support their convictions. They also contest the amount of restitution they have been ordered to pay. After an exhaustive review of the record, the briefs of the parties, and applicable law, we conclude that the evidence is sufficient to support Patricia White's conviction, but we are unable to reach the same conclusion for Craig White's facilitation conviction. Accordingly, we affirm Patricia White's conviction; the conviction of Craig White is reversed, and the charge is dismissed. Finding that the trial court made inadequate findings in assessing restitution, we further remand that issue for determination based on the required statutory findings. Finally, we take notice that based on three statutory enhancement factors (none of which involved prior criminal history), the trial court set the length of Patricia White's sentence at one year above the presumptive minimum sentence of three years; pursuant to *Blakely v. Washington*, ___ U.S. ___, 124 S. Ct. 2531 (2004), we modify her sentence to three years but leave undisturbed the length and terms of her probation.

**Tenn. R. App. P. 3; Judgments of the Circuit Court are Affirmed in Part, Reversed in Part, and Modified and Remanded in Part.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., concurred in results. DAVID G. HAYES, J., filed a dissenting opinion.

Timothy Crocker, Milan, Tennessee (at trial); and Daniel J. Taylor, Jackson, Tennessee (on appeal), for the Appellees, Patricia White and Craig White.

Paul G. Summers, Attorney General & Reporter; J. Ross Dyer, Assistant Attorney General; and John C. Zimmerman, District Attorney General, *Pro Tem*, for the Appellee, State of Tennessee.

**OPINION**

In 1990, a group of West Tennessee hog producers conceived the idea of forming a cooperative to pool resources, sell hogs directly to various stockyards, and save on feed and grain costs. To that end, Cooperative Pork Services ("CPS") was incorporated in June 1990, and its membership grew to include hog producers in Tennessee, Mississippi, Alabama, and Kentucky.

CPS coordinated the pickup and delivery of hogs. Producers would telephone the CPS office to "book" a certain number of hogs. As soon as a truck load -- approximately 175 to 180 hogs -- were booked in a particular area, CPS reserved slaughter and packing dates for that particular load of hogs. CPS handled the transportation and was responsible for collecting the money and distributing the proceeds to the producers.

The money collected from the sale of the hogs was deposited into a "custodial" bank account maintained by CPS. The producers were paid by checks issued through the custodial account, and transportation, slaughter, and packing expenses were also paid from that account. In theory, the custodial account should have balanced out to zero after each shipment. To cover payroll for office employees and other business expenses, CPS charged its members a small commission of $0.70 for each hog that was handled and a 3.5 percent commission for purchases of supplies, such as feed. These commission-type charges were deposited into a "general" operational bank account maintained by CPS.

From virtually its inception, CPS was plagued by financial and managerial problems. The directors on CPS's board were occupied with the demands of their own livestock and other farming activities, which left little time to monitor CPS's activities. The original CPS manager, Phil Hooker, had prior experience working for a hog packing company in Union City, and his background ostensibly was an asset for the fledgling cooperative. In 1993, however, CPS board members discovered that Hooker had been misappropriating CPS's funds.

The defendant, Patricia White, and another woman, Valerie Baker, were CPS office employees during Hooker's tenure. Evidently, neither woman was suspected of complicity in Hooker's larceny. Beginning in 1994, in the aftermath of Hooker's misappropriations, the defendant Patricia White assumed more responsibilities for the day-to-day operations of CPS. CPS records and office equipment were removed from Hooker's residence, and a new base of operations was ultimately established in the Milan residence of the defendants Patricia and Craig White.

In 1998, financial irregularities at CPS were suspected and investigated. Investigators reviewed CPS documents, subpoenaed bank records, and applied for and executed a search warrant on October 2, 2001, for the defendants' Milan residence. The search uncovered, *inter alia*, additional CPS records and the defendants' 1996-1998 tax returns. Based on the investigation's

results, the Gibson County Grand Jury charged Patricia White and her husband, Craig White, with theft over $60,000 and criminal forfeiture.[1]

The defendants pleaded not guilty. At the conclusion of a lengthy trial, the jury found the defendant Patricia White guilty of the lesser-included offense of theft over $10,000 and found the defendant Craig White guilty of facilitation of theft over $10,000. The trial court sentenced the defendant Patricia White to a term of four years, suspended, and fifteen years' probation. The defendant Craig White received a sentence of two years, suspended, and two years' probation. The defendants were held jointly liable for $124,000 in restitution and ordered to pay $400 per month.

Aggrieved by their convictions and sentences, the defendants have appealed. Inasmuch as the defendants vigorously assail the sufficiency of the convicting evidence, we begin with a detailed summary of the testimony and proof at trial.

George Irvin Cooper, Jr. and Mark Smith, both hog producers, were instrumental in forming CPS in 1990, and they served on the board of directors. Mr. Cooper testified as the state's lead witness. He explained the impetus for setting up CPS and its general operating features and services. Cooper described himself as having the most active role in the day-to-day operations of the business because of his proximity to the office. He had the board's authorization to sign CPS checks, as did Mr. Smith and the office employees. Each check required two signatures, but Cooper regarded the precaution as "totally useless," because neither he nor Smith had time to go to the office every time a check had to be issued. As a result, when either man was at the office, he would sign and leave multiple blank checks that the office staff would later fill out and use.

Cooper testified that he "basically ran the business with the help of the office over the phone" after Hooker was discharged in 1993 for misappropriating funds. All available records and equipment were removed from Hooker's house, and for approximately one or two months the office operated out of a farm house owned by one of the office employees, Valerie Baker. During that time, CPS transferred its accounts to Union Planters Bank in Milan. Thereafter, the office for CPS was relocated to a garage room at the defendants' residence on Chapel Hill Road.

Cooper testified that after Hooker departed, the board authorized the defendant Patricia White to be paid seven dollars an hour. By late 1998, her hourly rate of pay had been raised to ten dollars. In addition, CPS paid $400 per month as rent for use of the defendants' residence and to defray part of the cost of the defendants' homeowners' insurance. Cooper believed that the defendant Patricia White also received ten days of paid vacation each year.

---

[1] After the jury returned its verdict in this case, the record reveals a brief exchange between the trial court and the state with the court inquiring whether the state desired to *nolle prosequi* the criminal forfeiture count in the indictment. The state replied that it did so intend. The record before us, however, contains no judgment or order disposing of that count. On remand, the trial court should enter an appropriate disposition so that the record is complete.

Cooper said that he was physically in the office only once or twice a month and that his primary contact was by telephone. The office did not have a time clock, and employees were trusted to keep track of their time. Cooper would go by the office to get needed information for the monthly board meetings. Most of the information, according to Cooper, was maintained on computer, and the defendant Patricia White would retrieve for him figures relative to sales and expenses. Cooper did not attempt to independently verify the information owing to his unfamiliarity with computers. In terms of CPS's bank statements, Cooper testified that they were mailed to the defendants' residence and that he never reviewed them. The defendant Patricia White was responsible for reconciling the accounts.

Cooper identified August 17, 1998, as the first occasion when he learned of anything wrong with CPS's finances. He testified that the defendant Patricia White called and advised him that the custodial account was overdrawn by about $26,000, that the general account was overdrawn by about $20,000, and that the bank was preparing to return all the checks that had been issued. Cooper said that he deposited $50,000 of his own money into the accounts as an interim solution until the problem could be identified and resolved. Over the next several days, Cooper was in daily contact with the office to find out if any bank errors had been discovered. When nothing materialized, Cooper sent his father, who had experience with tax-related matters, to the office to check for any bank errors. When Cooper's father was unable to discern the source of the problem, Cooper asked the defendant Patricia White for the bank statements and cancelled checks related to the custodial account. Cooper testified that he planned to review the records over the Labor Day weekend. He said that Smith was the only board member consulted about the problem at that time.

The records revealed that money had been transferred into and out of the custodial account. The state asked Cooper about transfers out of the custodial account that he may have authorized. He testified about an occasion when the defendant Patricia White was out of town and another office employee, Amy Stoots, called him to report that the general account had become overdrawn. Cooper instructed Stoots to transfer money from the custodial account to cover the shortfall. Initially, Cooper denied authorizing any other transfers out of the custodial account. On cross-examination, however, he acknowledged directing that a check be issued from the custodial account in 1996 for $5,000 payable to the First Assembly of God. Cooper explained that the money was owed to him for hogs that had been sold; he wanted to make a donation to the church, so he had the money transferred directly.

Ultimately, the missing-funds problem was disclosed to CPS's board, and the board decided that the only way to "get to the bottom" of what was going on was to close down CPS and cover the outstanding checks in the custodial account. Cooper testified that when that happened, a shortfall of approximately $120,000 to $125,000 emerged. Cooper said that he and Smith funded the shortfall and then turned to impounding the CPS records kept at the defendants' residence. The defendants turned over some, but not all, of the records. Cooper took the retrieved records to a certified public accountant in Jackson. Cooper admitted that the board members were "poor business managers" and were "negligent" in failing to have CPS audited annually. He explained that money

was also a consideration, inasmuch as a professional audit performed in the aftermath of Hooker's misappropriations had cost CPS $26,000.

Based on the accountant's findings, Cooper attempted to set up a meeting with the defendants. Cooper said that the defendants declined to meet, even after Cooper retained an attorney to communicate with the defendants' counsel. When nothing could be done, the local district attorney general's office and the Federal Bureau of Investigation were contacted. The FBI referred the matter to the state authorities, and after a lengthy investigation, the Gibson County Grand Jury presented criminal theft charges against the defendants.

In terms of what CPS had authorized the defendant Patricia White to do, Cooper testified that the "board had told her that if she needed to work overtime that she could." Cooper denied having any private arrangement with the defendant to pay her "under the table" for CPS-related work in addition to her regular wages. Cooper was specific that neither he nor the board authorized her to receive anything other than her hourly wages and the monthly office rental and insurance. Cooper was equally specific that he never authorized her to pay her personal credit card bills out of CPS funds.

The defense cross-examination of Cooper aimed to discredit his motives for giving testimony against the defendant Patricia White. The defense inquired whether Cooper had ever made romantic advances toward her and if he had made inquiries about her sexual involvement with someone other than her husband. Cooper denied any inappropriate behavior on his part but admitted asking a male acquaintance about "making a pass" at the defendant. He also denied that his wife urged him to fire the defendant. The defense elicited from Cooper that he did not contest the defendant's receipt of unemployment compensation after her job termination.

The defense also cross-examined Cooper about the overall careless management of CPS. Cooper acknowledged that CPS never filed a tax return during its eight-year existence from 1990 to 1998. Cooper tried to assign blame to the defendant Patricia White for not providing the information necessary to prepare a return; the problem, however, predated the defendant's management of the office. Additionally, Cooper tried to claim that the board was not aware of any problem with the custodial account in 1995. Minutes in Cooper's own handwriting, from an April 3, 1995 board meeting, contradicted that claim. The minutes reported a $1,800 to $2,000 shortage of funds in the custodial account.

The defense secured Cooper's concession that he had asked the defendant to perform a lot of back work for CPS to straighten out the problems that Hooker had created. Moreover, Cooper testified that he did not place any restrictions on or limit the amount of time that the defendant worked. Even so, Cooper explained that the board should have been notified of the magnitude of the extra work that the defendant claimed to have performed. Most of the compensation for the "extra work" was not reflected in the defendant's W-2s, and although the defendant did not prepare the W-2s, she did provide the information upon which the W-2s were based.

Cooper was shown numerous CPS checks bearing his signature and payable to the defendant Patricia White. He did not deny signing the checks but stated that he always signed CPS checks in blank. Cooper testified that once he began reviewing the records and bank statements in 1998, it became apparent that the defendant had written approximately 400 checks payable to herself from 1995 through 1997. Cooper admitting knowing that the defendant was advancing CPS money to one hog producer who was in a cash-flow crunch. He also knew that the defendant was advancing money for overnight mail so that producers could get their checks more quickly. The defense asked Cooper to identify a specific check *from the custodial account* that constituted a theft by the defendant. Cooper responded, "There are none."

State witness Mark Smith offered additional insights into the operations of CPS. He testified that when the problem arose with Hooker in 1993, the defendant was one of the people in the office who was being trained. The defendant was in charge of handling the accounts payable and receivable. Smith said that, before the office was transferred to the defendants' residence, he would stop by the office once or twice a week to sign checks or see if he could help with anything. After the move, Smith seldom checked on the office because the money and the accounts had been audited and changed to correct the problems that Hooker had created.

Smith explained that although CPS's board tried to meet once a month, often the meetings were several months apart because of the farmers' hectic work schedules. Smith described the meetings as casual. Usually the board would receive an oral report about the cooperative's financial situation. Smith recalled seldom seeing any written report; either the defendant Patricia White would write down figures and bring them to the meeting, or she would provide figures for Cooper to present at the meeting. The information provided to the board included the payroll expenses of the office employees. Smith testified that the defendant Patricia White was present for some of the board meetings when payroll expenses were disclosed.

According to Smith, some board members believed the office salaries were too high. Smith kept a folder with notes of the meetings to monitor what was being reported for wages paid. In terms of overtime compensation, Smith believed the board may have discussed it to some limited degree. He said that the board always understood that the office personnel may need to work overtime to take care of a hog producer. Smith gave as an example that paperwork for a particular shipment of hogs might be delivered late in the afternoon, requiring the office staff to work past 5:00 p.m. Even so, Smith was under the impression that relatively little overtime was required.

Smith did not recall any occasion when the defendant asked his permission to spend extra money. Smith did remember that the defendant advised him that she could secure shipment of certain products for the hog producers by using a credit card. Because CPS did not have a business credit card, Smith authorized the defendant to use her personal credit card as long as she documented what was purchased and the reimbursement. Smith said that he was never shown any such documentation. Smith also authorized the defendant to use CPS's business license to purchase gift items from a company known as ABC, provided that the defendant document the transactions.

As did Cooper, Smith testified that the first inkling of trouble came Labor Day weekend in 1998 when Cooper called him upset that money was missing and that the bank was poised to decline payment on checks from the custodial account. Smith recalled going to the defendants' residence on two or three occasions to investigate the problem. When he and Cooper first made basic inquiries about expenses, the defendant looked up information on the computer. The next time, the men returned looking for specific checks. Smith said that the defendant could not produce the checks. "Things just weren't balancing out," Smith testified. As far as Smith and Cooper could discern, money had been transferred on an ongoing basis from the custodial account into the general account. Smith denied authorizing the transfers even though his signature appeared on some of the checks. Smith explained that he could "never remember ever writing a signature on a check that was already filled out. I was usually the first name on the check."

Finally, Cooper and Smith asked for all the records. Smith drove his truck to the defendants' residence and loaded up boxes, desks, chairs, and computer equipment, which the defendants had set out in their carport. Smith said that he thought he had gotten everything; however, additional CPS records were found at the house when the search warrant was executed in October 2001.

Smith and Cooper sorted through the records and took many of them to the accountant who had previously audited CPS after Hooker's departure. Cancelled checks were missing from some of the bank statements, and copies had to be ordered from the bank. Smith said that in going through the bank statements, it "immediately hit him" that as many as ten to twelve checks per month had been written payable to the order of the defendant and drawn on CPS's general account. The same information showed up on the office computer, when Smith accessed the files. Smith estimated that at most six checks per month should have written to the defendant: four or five checks for weekly payroll and one check for the office rent/insurance. Smith had believed that the defendant was earning between $18,000 to $20,000 per year. Instead, what he discovered was that the defendant was being paid "almost twice that much." Equally troubling, payroll taxes had not been taken out of most of the checks.

Smith testified, "So, to make a long story short, I put up $62,000 of my money, and I think Mr. Cooper put about the same amount of his." That money covered the shortages created by the transfer of funds from the custodial account to the general account and the subsequent withdrawal of monies from the general account. Smith had not been reimbursed for his contribution.

Smith was adamant that the board never authorized compensation for the defendant in the amounts they discovered. Indeed, the board minutes from a meeting in January 1996 reflected a current hourly rate of compensation of $8.50 for the defendant and $7.50 and $5.00, respectively, for the two other office employees. At the January meeting, as shown in the minutes, the board approved increasing the defendant's compensation to $10.00 per hour and another employee's compensation to $8.00 per hour.

Smith was asked on cross-examination if he knew that the defendant had on occasion paid other employees out of her personal funds. Smith was unaware but agreed that if it happened, the defendant was entitled to reimbursement. Regarding overtime, Smith reaffirmed his knowledge that overtime was required on occasion. He certainly, however, did not know about any sort of "unrestricted" ability on the defendant's part to work overtime. Smith insisted that the board was not notified that the defendant was working unrestricted overtime, and he bluntly retorted, "[I]f it was reported to us that she was making twice her salary, we would have stopped it." Moreover, regardless of the overtime Cooper may have authorized, Smith said that the board expected its employees to be honest. The defendant, however, misrepresented how much CPS was paying out in wages, and she hid the information from the board knowing that the board was relying on her to provide an accurate accounting of income and expenses.

Smith did not dispute that in some respects CPS was "run sloppily." For instance, Smith knew that CPS had never filed a tax return. He testified that the board erroneously believed that Hooker had been filing the returns. After Hooker left, the board enlisted the help of Cooper's father for preparing tax returns. Cooper's father was unsure how to proceed, because he could not determine if CPS had been registered as a non-profit corporation and because he had never filed a return before for a cooperative. As a result, no progress was ever made in straightening out CPS's tax status and potential tax liability. Cooper's father did, however, prepare the W-2s for the office employees. The defendant provided the information that Cooper's father used to prepare the W-2s.

The criminal investigation of the defendants' activities spanned several years. Smith related that initially the local district attorney general advised them to enlist the FBI's assistance. Approximately two years later, in the wake of the Columbine shootings, the FBI assigned the investigation to the "back burner," at which time the investigation was turned over to the local authorities. The defendant Patricia White then was indicted for theft in July 2000; her husband was not charged until January 2002.

The state presented brief testimony from the former President of Union Planters Bank in Milan, Wayne Minton, and from Elizabeth Ownby, a records custodian with the bank. Mr. Minton met with Cooper and Smith in September 1998 to discuss the CPS checks that were being presented with insufficient funds to cover them. Mr. Minton recalled that the CPS accounts occasionally had been on the bank's insufficient funds report, and he knew that Cooper and Smith advanced their personal funds to cover the checks being presented in September. Ms. Owenby introduced, without defense objection, the Union Planters checking account records of the defendants from November 1995 through 1998.

The state presented the meat of its case, in terms of specific financial transactions, through the testimony of Investigator Virginia Draper, who over a period of many months, had subpoenaed, reviewed, and analyzed the defendants' personal bank account records. Investigator Draper also reviewed records that Smith and Cooper had obtained and records that later were seized by search warrant from the defendants' residence. With the available records, Investigator Draper

created a computerized spreadsheet showing the various CPS checks payable to the defendant Patricia White or payable to third parties for her benefit.

The spreadsheet covered the time period of November 1995 through September 1998. The beginning month and year were chosen based on the earliest records that Union Planters Bank could supply. Investigator Draper explained that in reviewing the records, she first determined the total amount of CPS checks deposited monthly into the defendants' joint bank account, then subtracted the defendant Patricia White's monthly wages and office rent/insurance payment, and finally added any CPS payments made directly to the defendants' credit card companies and telephone carrier. Investigator Draper summarized her findings for the jury and reported the following amounts of money over and above the allowed wages and office rent/insurance:

| **1995** | **1996** | **1997** | **1998** |
|---|---|---|---|
| Nov.: $2,214.36 | Jan.: $4,628.26 | Jan.: $3,154.84 | Jan.: $4,239.05 |
| Dec.: $5,603.00 | Feb.: $3,592.79 | Feb.: $1,849.33 | Feb.: $685.97 |
| | Mar.: $4,293.89 | Mar.: $4,504.20 | Mar.: $1,128.50 |
| | Apr.: $5,247.09 | Apr.: $3,486.15 | Apr.: $3,173.73 |
| | May: $4,958.08 | May: $1,992.15 | May: $3,292.91 |
| | Jun.: $2,908.27 | Jun.: $5,112.28 | Jun.: $6,012.87 |
| | Jul.: $3,832.71 | Jul.: $4,218.04 | Jul.: $2,527.41 |
| | Aug.: $3,551.15 | Aug.: $2,308.49 | Aug.: $3,252.54 |
| | Sep.: $4,558.96 | Sep.: $4,729.68 | Sep.: $3,736.65 |
| | Oct.: $5,731.33 | Oct.: $3,785.42 | |
| | Nov.: $2,083.37 | Nov.: $3,356.04 | |
| | Dec.: $4,011.38 | Dec.: $4,777.63 | |

The total for the months covered was $128,939.29.

Investigator Draper also testified about executing a search warrant for the defendants' residence on October 2, 2001, to search for CPS records and evidence of how the money misappropriated from CPS had been spent. Investigator Draper introduced multiple photographs taken inside and outside the residence. Investigator Draper testified that a Honda ATV, a riding lawn mower, and two tractors were parked outside and that a great deal of power tools were in the garage. Inside the residence she found, *inter alia*, racks and piles of clothing, some of which had price tags affixed; "boxes and boxes" of shoes, many of which appeared unworn; a significant amount of jewelry with the price tags still affixed; bags and stacks of unopened VCR tapes; and well-appointed kitchen cabinets. Most notably, Investigator Draper also discovered more CPS records and the defendants' tax returns for the years 1996 through 1998. For 1996, the defendants reported a combined net income of $41,548.07; for 1997, $47,465; and for 1998, $49,378.

On cross-examination, the defense extracted numerous concessions from Investigator Draper, such as that the jewelry found in the residence was inexpensive, that she did not check the

sizes on the shoe boxes, that the defendant reported that the clothing in the garage was left over from a recent garage sale, that another office employee's salary had been advanced once by the defendant, and that the defendant had advanced her personal funds to cover items for CPS. Also, Investigator Draper agreed that she was unable to determine how all of the missing CPS money had been spent by defendants; she had been told, moreover, that the defendant Craig White had inherited a substantial amount of money in 1994.

Regarding expenses for food sundries, Investigator Draper did not credit the snacks and soft drinks that the defendant had purchased. Investigator Draper said that both Cooper and Smith told her that those purchases were not legitimate business purchases. As for the defendant's telephone bills, Investigator Draper said that Cooper explained that he had given the defendant authority to repay herself for long-distance business calls made on her home telephone, but he did not authorize payment for cellular telephone calls.

The state's two final case-in-chief witnesses were Gibson County Sheriff's Deputies, who were present when the search warrant for the defendants' residence was executed. Deputy Jeff Maitland testified that the bulk of the clothing that he saw appeared to be new with tags still attached. Before his law enforcement career, Deputy Maitland had sold vacuum cleaners. From that experience, he knew that the vacuum cleaner in the defendants' residence was very expensive, selling new for over $1,000. Deputy Steve Grooms testified that the defendants did not complain in his presence about how the search was conducted.

The defense opened its case by calling Irvin Cooper's wife, Carol Cooper. Ms. Cooper, a school teacher, was not involved in the operation or management of CPS. Occasionally, she would pick up blank CPS checks from the defendant, which her husband then signed and which she returned to the defendant. Otherwise, her involvement consisted primarily in assisting her husband in reviewing CPS's financial records after the overdraft problems surfaced in 1998. Ms. Cooper testified that the overdraft bank charges totaled approximately $12,000.

On cross-examination by the state, Ms. Cooper discussed in greater detail her involvement with reviewing CPS records. Through Ms. Cooper, the state then introduced as exhibits the payroll records for the defendant and the other office employees and a Tennessee Department of Employment Security report concerning wages submitted for the defendant and another office employee. For the last quarter of 1997, the defendant reported that she had earned $4,144. The report bore the signature of the defendant.

The defendant Patricia White testified in her own defense. She began by relating her personal and employment history. At the time of trial, the defendant was 43 years old, had been married for sixteen years, and had two children. Since being laid off at CPS, she earned money by performing commercial and residential cleaning.

The defendant said that before being hired by Hooker, she knew nothing about hog production or managing a livestock cooperative. She was a high school graduate with a cosmetology

license. She traced her knowledge of business finance to an earlier job she had working for Ronnie Boswell at Boswell Oil Company. During that time, the defendant learned to handle business checks and accounts payable and receivable. The defendant explained that she had authority to write checks for Mr. Boswell, and she paid his bills.

The defendant testified that she worked for Boswell Oil Company for fourteen years. During that time, no accusation of theft had ever arisen regarding her work. When the oil company closed down, the defendant continued to work for Mr. Boswell. Mr. Boswell and his brother owned Milan Raceway, and the defendant took over the financial end of the business and routinely handled large amounts of cash. Again, the defendant was never accused of stealing in connection with that job. The defendant worked at the racetrack for approximately two and one-half years, at which time Mr. Boswell sold the business. Mr. Boswell laid her off so that she could draw unemployment benefits. Her next employment was with CPS.

The defendant related that she had known Hooker through church activities. He offered her a job, and she started working at CPS in June or July of 1993. At first, the defendant was handling CPS's books and Hooker's personal books. Hooker paid her separately for the personal work she did for him. The defendant was hired at CPS at $8.00 or $8.50 per hour. She initially worked part time, but after Hooker's misappropriations were uncovered, she began working full time for CPS.

The defendant testified that she began to get suspicious of Hooker's activities when she could not locate records showing that payroll taxes for CPS had been paid. Then, when she compared CPS's computerized records and deposit books with Hooker's deposit books, she could detect how Hooker had been diverting CPS's funds to his personal accounts. The defendant alerted Cooper, who then informed the board of Hooker's misappropriations. The defendant characterized the financial condition of CPS at that time as "absolutely horrible" with the business books in a "mess."

Concerning the various locations for CPS's office, the defendant explained that when she first came to work, the office was in a space attached to Hooker's house. From Hooker's home, the office moved first to a farmhouse provided by Cooper. After a couple of months, the office was relocated to rental space on College Street in Trenton. Finally, in September of 1994, the defendants' residence became the base of operations for CPS.

The defendant said that she performed a lot of back work and record retrieval that was provided to the accountant who audited CPS after Hooker's termination. The defendant believed that Hooker retained an attorney and that the matter was ultimately settled with Hooker repaying some of the money. According to the defendant, Cooper told her that they would have to review a lot of old CPS records, that the work had to be done, and that he would pay her whatever it took to sort out the records. The defendant maintained that Cooper placed no restrictions on the amount of back work she was to perform. As far as payment for the back work, the defendant said that she kept up with her time, as Cooper had instructed her to do, but that payment for the back work was delayed

-11-

because CPS did not have the money to pay her at the time and because the true financial condition of CPS was not known.

The defendant testified that CPS's operation account had frequent overdraft charges. To the defendant's knowledge, the board was advised about the overdrafts, and she recalled occasionally attending board meetings when she reported the overdrafts. Overdraft charges also occurred in the custodial account, but those overdrafts were more sporadic. Regarding withdrawals from the custodial account, the defendant said that Cooper and, to a lesser extent, Smith authorized transfers on a regular basis to cover expenses in the operation account. At some point, Cooper authorized her to purchase drinks and snacks for the office; the defendant paid for the items out of her personal account and later reimbursed herself. As for receipts for personal money that she expended on CPS's behalf, the defendant admitted not doing a good job of record keeping. Also, she never reimbursed herself for work-related mileage and never charged CPS for any portion of her utility bills.

The defendant explained how CPS came to pay her telephone bill. In the beginning, CPS had two phone lines and a fax line. The producers began complaining that they were unable to get through on the existing lines to place their hog and feed orders. As a result, Cooper told the defendant that if she would also use her home telephone, he would ensure reimbursement by CPS. Sometimes, however, CPS did not have sufficient funds to reimburse her for telephone charges. Later, Cooper authorized the defendant to use her cellular telephone for business and to be reimbursed by CPS.

Also, the defendant testified Cooper was aware of the routine for handling office expenses. The defendant said that many times when CPS needed basic office supplies, CPS did not have sufficient funds to pay the vendor's previous bill. Rather than place an order when the last order remained unpaid, the defendant would pay for the new purchases from her personal funds and later reimburse herself.

In terms of her working schedule, the defendant stated that her regular hours were 8:00 a.m. to 5:00 p.m. During that time she performed current work, although producers might call her late at night needing assistance. The back work involved the problems that Hooker had created, and she tried to resolve sales tax issues. Evidently, CPS had never charged or collected sales tax. The defendant testified that Cooper instructed her to go back through the records since 1990 in preparation for re-billing each hog producer for items that were taxable. The defendant believed that Smith knew about this work.

The defendant Patricia White admitted that she created two separate sets of payroll records. She explained that Cooper instructed her to keep her back work hours separately; he did not want to disclose those hours to the board because they would not accurately reflect what CPS's operational costs would be once the back work was completed. The defendant added that Cooper never told her to hide her back work from the board, but Cooper did express concern that if the board knew what the back work was costing, the board would close down CPS.

The defendant was unable to explain why the hours for the back work were not reported on her W-2, but she admitted that she had not reported all of her income on her tax returns. She claimed that she and the other office employees kept up with their time, and the defendant gave the time sheets to Cooper to take to his father, who prepared the W-2 forms. The defendant mentioned a conversation with Cooper's father, at some unspecific time, wherein he assured the defendant that he would take care of all the paperwork and amending her tax returns.

The defendant testified that she had tried to reconstruct the receipts she had kept for items personally purchased for CPS for which she was entitled to reimbursement. Many of the receipts, she said, had been seized at the time the search warrant was executed, but there were also additional records in her automobile that were not confiscated. Many of the receipts were old and illegible. The defendant claimed that from the records she had to work with, the receipts totaled $23,784.17. The defendant admitted that she did a "cruddy job" of keeping up with the receipts. Additional matters for which the defendant received reimbursement involved personal checks she had written to cover the salary of other employees. For example, the defendant paid one employee, Tracy Rinks, $4,335. The defendant wrote six personal checks to another employee that totaled $191.

Patricia White next testified about her home and what the officers found when the search warrant was executed. She said that a boat on the property was titled to and belonged to Mr. Boswell's brother. The clothing inside the garage and other bagged items were left over from a garage sale the week before the search. The clothing inside the residence belonged to her, her husband, her sons, her deceased mother-in-law, and her sister-in-law, who was in the process of divorcing and living with the defendant. The jewelry, the defendant explained, was costume and relatively inexpensive. Many of the boxes inside her bedroom closet contained donated items that she planned to take on mission trips. For the last twelve to fifteen years, the defendant had been going on mission trips to Mexico.

Many of the shoes found were tennis shoes purchased from a store going out of business, which the defendant intended to send to an orphanage home. The lawn mower came from a neighbor whose yard the defendant Craig White was tending. The defendant testified that one of the tractors in her yard belonged to a friend who owned a construction company and who at one point put the tractor in her yard and advertised it for sale. The other tractor, she said, was jointly owned by her husband and another friend. As for personal transportation, the defendant testified that she drove a 1995 Oldsmobile with 185,000 miles on it and that her husband had a 1994 Ford Ranger with approximately 100,000 miles on it. Her residence was mortgaged at $147,000.

Regarding payment for back work, the defendant said that she reconstructed her time from what records were available to her. Cooper offered to pay her time and a half for her services. CPS did not have a time clock for the employees to punch, and the defendant never recalled either Cooper or Smith requesting to see her time records for back work. The defendant claimed that she noted her back work time on calendars kept in front of her desk. The defendant produced some of those calendars, which she said had been in her automobile and not seized by law enforcement.

-13-

According to the defendant, from 1994 to 1998, she received $113,408.06 in compensation for back work. In addition, the defendant testified that her son had been compensated $573 for entering information into the CPS computer; Cooper never objected to that arrangement, and he had been in the office when her son was working on the computer.

The defendant concluded her direct examination by denying guilt of the charged offense and emphasizing her crime-free prior history.

The state aggressively cross-examined the defendant. The state challenged the defendant's explanation of the calendars being in her automobile, the notations on the calendars of hours worked, and the sparse documentation of when she was out of the office on vacation or on a mission trip. The state also pointed out that the calendars appeared to have hours written down for practically every day. The state showed the defendant her calendar for October of 1997. The word "vacation" is written on the date of October 3, and the defendant claimed that she took a mission trip to Africa at that time. Another entry for October 3, however, purports to show that the defendant worked fourteen and one-half hours that day. Those hours did not appear on CPS's regular payroll sheets.

Forty-five additional hours appeared to be recorded on the calendar for the week of October 5, when the defendant was supposed to be in Africa. The defendant asserted that she carried business papers to work on during the trip. The CPS payroll sheets for the week ending October 10, however, showed no payroll check issued to the defendant.

The state questioned other calendar entries. The calendar for January 1995 purported to show that she worked ten regular hours and three hours of back time. The rate of $10 is written above the numbers. The state pointed out that the board had not increased her hourly wage to $10 until 1996, to which the defendant claimed that Cooper had given her and another employee "raises that the board knew nothing about." She added that Cooper had also given the employees days off and extra vacation days. When the state noted that according to her calendars, she worked all the time, the defendant then responded that she performed CPS back work on her off days.

The defendant did agree with the state that the information that Cooper reported to the board about the employees was false. The defendant blamed Cooper, stating that he did not want the board to know that he had authorized raises and days off for the employees. For the meetings that the defendant personally attended, she characterized Cooper's reports as "not accurate" and maintained that he intentionally misled the board.

The state continued to highlight the inconsistencies between the defendant's calendars and CPS's records. For example, the payroll records for October 1997 showed very few paid hours that the defendant worked, although her calendar noted significantly greater hours. When the defendant offered the explanation that CPS did not have sufficient funds to pay for all her time actually worked, the state confronted the defendant with checks she had written in October to herself, drawn on CPS's general account in the amounts of $425, $625, $400, $200, $337, $425, $425, $400,

$87.90, and $450. The $200 check was written to the defendant's credit card carrier, MBNA, and the $87.90 check was to pay the defendant's cellular telephone bill. The defendant then claimed that the checks represented payment for hours worked in previous months for which CPS did not have available funds.

As for the defendant advancing her personal funds to cover payroll for other employees, the state showed her CPS payroll records for Tracy Rinks for the period October through December 1996. For October, Rinks received a CPS payroll check every pay period with appropriate deductions. Rinks also received, however, a check on October 29 from the defendant's personal account. When asked what the personal check represented, the defendant responded it was for "back work" that Rinks had performed. Other similar checks were shown to the defendant for which she, likewise, claimed to be compensating Rinks for back work. None of the existing records showed that Rinks had worked back hours. The state elicited from the defendant that she and Rinks were related by marriage.

As for the defendant advancing personal funds to pay for items such as postage, Federal Express shipments, and office supplies, she said that she reimbursed herself "when funds were available." The state countered by producing and showing the defendant a multitude of checks written from CPS's account to pay vendors directly, indicating that expenses were routinely being covered by the business.

The defendant's testimony was interrupted at trial to accommodate the schedules of three other defense witnesses. United States Bankruptcy Judge Harvey Boswell testified that he had known the Whites for a considerable number of years and that their reputation in the community for truthfulness and dependability was good. He corroborated that the defendant Patricia White had worked for him at the racetrack and had handled tens of thousands of dollars of cash every Friday night. No suspicion of any wrongdoing by defendant Patricia White ever arose. Judge Boswell also explained that at one time he and the defendant Craig White jointly owned a boat. Ultimately, the defendant bought out Judge Boswell's interest in the boat. The state did not cross-examine Judge Boswell.

Milan General Sessions Court Judge Collins Bond testified that, when in private practice, he had previously represented the Whites. Judge Bonds related that he attempted to set up a meeting with the attorney representing CPS to discuss the theft allegations. The meeting never occurred, because after the defendants and CPS board members collected the information needed to sit down and meet, the other attorney called and advised Judge Bonds that he no longer was involved in the matter. The state did not cross-examine Judge Bonds.

The third defense witness taken out of order was Melissa McMinn, the co-owner of a pharmaceutical research business and a lifelong Milan resident. Ms. McMinn had known the defendant Patricia White for 27 years. Ms. McMinn testified about conducting joint yard sales with the defendant and about Ms. McMinn's husband habit of storing shop tools at the defendants' residence.

-15-

Ms. McMinn had taken vacations with the defendants and had accompanied the defendant Patricia White on several mission trips. Ms. McMinn testified that for the mission excursions, they would solicit clothes from anyone willing to donate and would distribute the clothing to adults and children. Ms. McMinn knew that the defendant had herself purchased items at the Dollar Store to take on the mission trips. Ms. McMinn credited the defendant with a good reputation for truthfulness.

On cross-examination of Ms. McMinn, the state focused on the mission trips. The state elicited that a mission trip was "definitely not a vacation." Ms. McMinn testified that they worked the entire time they were gone. When she and the defendant went together on mission trips, they roomed together. The state asked Ms. McMinn if the defendant did work for CPS while on these mission trips. The witness replied in the negative, "not at all."

When the defendant's testimony resumed, the state asked her about Ms. McMinn's statement that the defendant did not perform company work on the mission trips. The defendant blamed the state for not asking the witness for specific information about which mission trips they had jointly taken and not asking about the length of the airplane trip to Africa, which would have allowed for work to be done.

Joe McMinn, the defendants' next door neighbor, testified that he had stored numerous things at the defendants' residence, such as clothing, tools, and a motorcycle. Mr. McMinn and the defendant Craig White jointly owned a tractor, and both men had four wheelers. Mr. McMinn regarded the defendants as honest people. The defense elicited from him two conversations that he had with Cooper. On one occasion, Cooper came to his home and wanted him to unlock the defendants' house to leave a book and pick up records. Although Mr. McMinn had a key to the residence, he declined Cooper's request. Mr. McMinn said that ultimately Cooper left the book at McMinn's house but told him not to look at it. Mr. McMinn then left the defendants a message that he had something for them. The second conversation occurred after the discovery in 1998 that money was missing. Mr. McMinn testified that Cooper admitted, "There's nothing against Craig[, and] . . . he's hasn't done anything wrong. It's strictly between Patricia and us."

The defendant Craig White was the final defense witness. He related being born in Paris, Tennessee, moving to Milan, graduating from high school in 1968, attending business college at Jackson State, working at ITT in Milan, and having various other jobs. At the time of trial, Craig White worked at Graves Metal Service in Jackson. He had never been arrested.

The defendant described his wife's work schedule and habits after CPS's office was relocated in his house. The defendant testified that his wife worked very long hours. He personally knew that she had worked fourteen to sixteen hours a day at times to take care of the hog loads for the farmers. In addition, he said that his wife frequently worked on Saturdays and Sundays for CPS. To the defendant's knowledge, his wife had never inflated her working hours. Moreover, he knew nothing about his wife stealing from CPS. Rather, he stated, "I know she's given a lot to CPS."

Although he had never accompanied his wife on mission trips, the defendant knew that she would carry business paperwork with her.

The state's cross-examination of the defendant focused primarily on the couple's joint checking account. The defendant admitted that the bank statements came to the residence and that he signed the tax returns that were filed. He explained, however, that his wife took care of the checking account and that he seldom wrote checks on the account. His responsibility was to keep track of how much was spent on the construction of their residence.

The defendant testified that he trusted his wife's judgment. At times, she told him that she was putting money into CPS to get feed delivered to the producers. He knew that a lot of the money spent seemed to be on credit card bills, but he also stated that neither he nor his wife were claiming that everything charged to the credit cards were for CPS.

In rebuttal to the defense case, the state recalled Mark Smith and Investigator Draper and offered the testimony of a former courthouse clerk, Josephine Jackson. With Smith, the state simply clarified that he made two trips to the defendants' residence to pick up records and other office items. Ms. Jackson's contribution was having known Cooper's father for approximately 50 years, knowing that he had prepared tax returns for farms, and knowing that he was a highly respected individual.

Investigator Draper testified that she knew nothing about the defendants before becoming involved in the case. Regarding Patricia White's calendars, Investigator Draper informed the jury that while the search was ongoing, the defendants never mentioned any other calendars in an automobile. She also conceded, however, that the automobiles could have been, but were not, searched.

The jury deliberated on this evidence and returned verdicts finding the defendant Patricia White guilty of Class C theft and the defendant Craig White guilty of facilitation of a felony. This appeal ensued.

## I. EVIDENCE SUFFICIENCY

Both defendants contest the legal sufficiency of the evidence underlying their convictions. This court considers such a challenge in a jury trial strictly, viewing all of the evidence in the light most favorable to the verdict and overturning a conviction only if no reasonable jury could have concluded that the defendant was guilty beyond a reasonable doubt on each essential element of the charge. *See State v. Tracy Lorenzo Goodwin*, __ S.W.3d __, No. E2001-01978-SC-R11-CD, slip op. at 3 (Tenn. 2004); *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002). The state is afforded the strongest legitimate view of the evidence and all reasonable and legitimate inferences that flow from the evidence. *See State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). Moreover, this court does not re-weigh or re-evaluate the evidence, nor does it substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *Reid*, 91 S.W.3d at 277. A jury verdict

approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the verdict. *See State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994). Simply stated, the defendant, once convicted, is presumed guilty and bears the burden of proving that the evidence was insufficient. *See State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992).

With these ground rules in mind, we turn to both defendants' conviction offenses.

## A. Defendant Patricia White

The jury found the defendant Patricia White guilty of Class C theft of property valued over $10,000 but less than $60,000. She argues that her conviction should be overturned essentially because Cooper and Smith, who were her supervisors and CPS board members, authorized her to advance expenses for CPS and to work unlimited overtime, thereby effectively consenting to the reimbursement that she received for her overtime work and business expenses.

When the Tennessee General Assembly enacted the Criminal Code in 1989, the various larceny-related criminal offenses were consolidated into a single offense of theft of property to eliminate "the antiquated and confusing distinctions among various larceny-related crimes." *State v. Byrd*, 968 S.W.2d 290, 291-92 (Tenn. 1998); *see* Tenn. Code Ann. § 39-14-101 (2003) (theft statute embraces "embezzlement, false pretense, fraudulent conversion, larceny, receiving/concealing stolen property, and other similar offenses").

Pursuant to the statute enacted in 1989, "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103 (2003). Therefore, to obtain a theft conviction, the state must establish "(1) the defendant knowingly obtained or exercised control over property; (2) the defendant did not have the owner's effective consent; and (3) the defendant intended to deprive the owner of the property." *State v. Amanns*, 2 S.W.3d 241, 244-45 (Tenn. Crim. App. 1999). Consent is not effective if it is induced by deception. Tenn. Code Ann. § 39-11-106(a)(9)(A) (2003). Furthermore, a person "deprives" an owner of property when he or she disposes of the property, uses it, or transfers an interest in the property in such a manner as to make restoration unlikely. *Id*. § 39-11-106(a)(8)(C) (2003).

As we understand the defendant's arguments, she does not dispute that she knowingly obtained CPS's property in the form of money. Likewise, she does not controvert that she intended to deprive CPS of its property. The pivotal issue, according to the defendant, is whether she had effective consent to take CPS's property. "[T]he jurors [in this case] were in the best position to make determinations as to whether the defendant had effective consent." *State v. Mila Shaw*, No. W2001-02430-CCA-R3-CD, slip op. at 10 (Tenn. Crim. App., Jackson, Jan. 16, 2003), *perm. app. denied* (Tenn. 2003).

Viewed in a light most favorable to the state, the evidence at trial clearly was sufficient for a rational jury to conclude that the defendant Patricia White did not have the effective

consent of CPS to convert its property in the form of money withdrawn from CPS's bank accounts. At the outset, we observe that although success may have crowned the defendant's efforts to expose the overall careless management of CPS and to portray the CPS board members as "poor business managers," those efforts were largely irrelevant to the question of effective consent. That CPS board members may have been lax in ferreting out the true financial condition of the business did not, thereby, confer tacit authority or effective consent for the defendant to manage the business finances however she desired.

As far as what Cooper may or may not have led the defendant to believe and his involvement as the defendant's supervisor, the parties were at odds throughout the trial. It is, however, undisputed from the proof that virtually all of CPS's board members were misled about the "wages" that the defendant was receiving. The defendant, moreover, was present at some of the board meetings when payroll expenses were disclosed and discussed; she knew that the board members were receiving erroneous information and that Cooper was intentionally misleading the board. Smith testified unequivocally that the board *never* authorized compensation for the defendant in the amounts later discovered. In addition, according even to the defendant's account of events, Cooper expressed his concern that if the board knew what the back work was costing, the board would close down CPS.

That "effective consent" requires "lawful consent" ought to be self-evident. Cooper was not authorized by the board of CPS to set the defendant's compensation at whatever rate he so desired or without consideration of the other operating expenses of the business. Smith testified that office salaries were a specific board concern, and he kept a folder of notes from board meetings to monitor what was being reported for wages paid. Inasmuch as a rational jury was entitled to find that the defendant knew that Cooper was not authorized by the board to unilaterally determine employee compensation, the jury was justified in concluding that Cooper's "consent" was not "effective" to exonerate the defendant from criminal culpability. *See* Tenn. Code Ann. § 39-11-106(a)(9)(B) (2003) ("Consent is not effective when . . . [g]iven by a person the defendant knows is not authorized to act as an agent.").

Regarding the defendant "reimbursing" herself for business expenses, the jury was entitled to credit Cooper's testimony that he did not authorize the defendant to pay her personal credit card bills out of CPS funds. The jury was, likewise, entitled to accept Investigator Draper's testimony that when she interviewed Cooper and Smith, the men informed her that purchases of snacks and drinks were not legitimate business expenses and that although the defendant was authorized to repay herself for business-related long distance calls made on her home telephone, she was not authorized to pay her cellular telephone charges. Furthermore, even though Smith acknowledged giving his permission for the defendant to use her personal credit card to facilitate shipment of certain products for the hog producers and to use CPS's business license to purchase gift items from a company known as ABC, Smith testified that he conditioned his permission on the defendant documenting the transactions. Smith said that he never saw any such documentation, and the defendant attempted to excuse her actions on the basis that she did a "cruddy job" of keeping up with receipts.

Other telling bits of inculpatory evidence included the sheer number of CPS checks -- approximately 400 -- that the defendant wrote to herself from 1995 to 1997. In addition, the defendant's income tax returns for 1996, 1997, and 1998, seized from her residence, failed to report thousands of dollars withdrawn from CPS, and she had no ready explanation why her W-2 forms did not accurately reflect the "wages" paid by CPS.

A reasonable jury, moreover, easily could have concluded that the defendant exaggerated the amount of back work that she performed in an *ad hoc* attempt to justify the sums of money diverted each month from CPS. The state discredited the defendant's never-before-seen calendars, on which she claimed to have kept track of her hours devoted to back work. The calendars had entries for nearly every day, including holidays and days that the defendant was off work or on vacation, and an hourly rate of $10 was noted on the calendar for January 1995, even though CPS's board had not approved that rate until 1996. The defendant's explanations that she did back work on her days off, that she carried and worked on business papers during out-of-town mission trips, and that Cooper had given "raises that the board knew nothing about" were hardly compelling or persuasive. In particular, the testimony of defense witness Melissa McMinn, who roomed with the defendant on mission trips, was devastating to the defendant's claim of multiple hours spent on CPS paperwork while on mission trips. Finally, toward the end of the defendant's testimony, the inconsistencies between her calendars and CPS's records became even more evident, and the defendant's efforts to reconcile the inconsistencies became increasingly implausible.

From its verdict, the jury accepted much, but not all, of the state's theory of the case. Finding the defendant guilty of a lesser grade of theft, the jury obviously concluded that the defendant had performed many legitimate services for CPS and was entitled to reimbursement for certain legitimate business expenses. The verdict was eminently reasonable and rational from the proof presented, and the conviction, accordingly is affirmed.

## B. Defendant Craig White

The jury found the defendant Craig White guilty of Class D facilitation of theft of property valued over $10,000 but less than $60,000. He argues that his conviction is infirm because the state introduced no evidence that he furnished substantial assistance that facilitated any theft that his wife may have committed. The sole proof, he contends, that he was married to his wife, had a joint bank account with her, and signed their joint tax returns is legally insufficient to support his conviction. As we shall explain, we agree, reverse his conviction, and dismiss the charge against him.

Before an accused can be convicted of facilitating a felony, the state must demonstrate the commission of a specified felony and the assistance that the accused provided to the person committing the felony. *See State v. Parker*, 932 S.W.2d 945, 950-51 (Tenn. Crim. App. 1996). To be precise, Code section 39-11-403, denoted "Criminal responsibility for facilitation of felony," provides: "A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under

§ 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (2003). Facilitation is punishable in an offense class next below the facilitated felony. *Id*. § 39-11-403(b) (2003). "As such, facilitation is a lesser-included offense when the accused is not the active malefactor involved in the crime." *State v. Clifford Leon Farra*, No. E2001-02235-CCA-R3-CD, slip op. at 11 (Tenn. Crim. App., Knoxville, Dec. 10, 2003), *perm. app. denied* (Tenn. 2004).

Here, the evidence viewed in the light most favorable to the state established only, as the defendant claims, that he shared a bank account with his wife and signed their joint tax returns. The defendant Craig White, furthermore, testified without contradiction that his wife took responsibility for their checking account and that he seldom wrote checks from the account. The evidence is undisputed that he had no employment connection to CPS. The photographs of the defendants' residence and personal property added little to the state's case, because the state established no concrete connection between any particular item and money taken from CPS; indeed, in some instances, the proof showed that photographed items were not even owned by the defendants.

Our research discloses no case wherein criminal responsibility for facilitation was predicated on this kind of innocuous evidence. For its part, the state simply argues that the defendant provided substantial assistance to his wife by signing tax returns to conceal her crimes and by not stopping or reporting his wife to the authorities. At the conclusion of the state's case, the trial court expressed grave reservations about the sufficiency of the state's evidence concerning the defendant Craig White. "Now, poor Mr. White, I haven't heard a word about him in this trial. Now, where does he fit in?" From its later comments, the trial court evidently decided against dismissing the charges because it might signal to the jury that his wife was guilty. The court said, "And I don't know how a jury would interpret that, at this stage of the proceedings, if they don't see him sitting there tomorrow morning." Then at the conclusion of the proof, the trial judge reiterated, "I don't like to separate defendants because of the inference juries might find."

When the evidence sufficiency was raised a final time in connection with the new trial motion, the trial court declined to disturb the jury's verdict. At that time, it commented that the evidence was sufficient for the jury to find "there was substantial aid[,] and he received benefits from the theft by his wife." We mention these remarks because the receipt of benefits does not thereby establish guilt by facilitation of a felony. The key feature of facilitation is knowingly furnishing substantial assistance to the perpetrator of a felony, not benefitting in the proceeds. *Compare* Tenn. Code Ann. § 39-11-403(a) (2003) (facilitation of felony), *with id*. § 39-11-402(2) (2003) (criminal responsibility for conduct of another by acting with intent to benefit in proceeds of offense). Regardless of benefit, the key component of facilitation -- knowingly furnishing substantial assistance -- was never shown in this case, for which the defendant Craig White's conviction must be vacated.

-21-

## II. SENTENCING

### A. Restitution

The defendants[2] contest the trial court's order of restitution in the amount of $124,000. Their argument is two-fold. Indicted for the offense of theft of property in an amount over $60,000, the jury acquitted both defendants of that charge and, instead, convicted the defendant Patricia White of the lesser-included offense and amount of theft over $10,000 but not exceeding $60,000 and convicted the defendant Craig White of facilitation of theft in a like amount. Accordingly, the defendants insist that the trial court was not authorized to order restitution in excess of the jury's verdict. Alternatively, the defendants contend that the amount of restitution ordered was excessive as not taking into consideration their financial resources and their future ability to pay.

As authority that restitution in excess of the jury's verdict is improper, the defendants rely on Code section 40-20-116. The state counters that Code section 40-35-304 is applicable because the trial court ordered restitution as a condition of probation. *See* Tenn. Code Ann. § 40-35-304(a) (2003) ("A sentencing court may direct a defendant to make restitution to the victim of the offense as a condition of probation."). Our analysis reveals that both parties are partly correct.

Code section 40-20-116 provides, in relevant part as follows:

> **40-20-116. Order of restitution. --** (a) Whenever a felon is convicted of stealing or feloniously taking or receiving property, or defrauding another thereof, the jury shall ascertain the value of such property, if not previously restored to the owner, and the court shall, thereupon, order the restitution of the property, and, in case this cannot be done, that the party aggrieved recover the value assessed against the prisoner, for which execution may issue as in other cases.

Tenn. Code Ann. § 40-20-116(a) (2003). By its clear terms, this statute imposes a mandatory obligation that restitution be ordered whenever a defendant is convicted of a theft-related offense. *See State v. Charles Chesteen*, E1999-00910-CCA-R3-CD, slip op. at 13 (Tenn. Crim. App., Knoxville, Jun. 8, 2000) ("[R]estitution in theft cases is mandated and controlled by a specific provision found in Code section 40-20-116(a).").

The state suggests that the requirements of Code section 40-20-116 are irrelevant because the trial court ordered restitution as a condition of the defendants' probation, pursuant to Code section 40-35-304. As we view the matter, there are several interrelated issues to be considered. The first issue is whether restitution in theft cases is exclusively controlled by section

---

[2] Even though the defendant Craig White's conviction is reversed and dismissed, we will still address his remaining issue to facilitate possible Supreme Court review. *See State v. Patterson*, 966 S.W.2d 435, 442 (Tenn. Crim. App. 1997); *State v. Woodcock*, 922 S.W.2d 904, 912 (Tenn. Crim. App. 1995).

40-20-116. The second issue involves the effect of the jury's verdict regarding the range of theft committed on the amount of restitution that the sentencing court may order. The last issue, noticed by this court, is whether the United States Supreme Court's recent opinion in *Blakely v. Washington*, ___ U.S. ___, 124 S. Ct. 2531 (2004), acts as a constitutional limitation on the amount of restitution that may be imposed.

"The mandatory language of [40-20-116] distinguishes the particular functions of the judge and the jury; it implicitly authorizes the trial court to 'order the restitution of the property' or allow to the victim a recovery of its value only when the jury has first ascertained its value." *State v. Bryant*, 775 S.W.2d 1, 4-5 (Tenn. Crim. App. 1988), *perm. app. denied* (Tenn. 1989). Our review of the record in this case reveals that the jury was instructed that if it found either defendant guilty of theft it must "fix the value of the property or services obtained along with its verdict *by indicating which of the following ranges the value falls within*." (Emphasis added.) Consistent with that instruction, the jury reported its guilty verdict in terms of more than $10,000 but less than $60,000. The jury was never asked to refine further the value of the property.

In *State v. Kai Nielsen*, No. 03C01-9807-CR-00233 (Tenn. Crim. App., Knoxville, Dec. 28, 1999), *aff'd on other grounds in State v. Nielsen*, 44 S.W.3d 496 (Tenn. 2001), the defendants were found guilty of Class C felony theft involving the sale of stock. As in the instant case, the jury was instructed that it could fix the value of the property within one of four ranges. *Id*., slip op. at 4. At sentencing, the court set restitution in the amount of $25,000, *id*., slip op. at 5, which fell within the Class C theft grading of more than $10,000 but less than $60,000.

Relying on Code section 40-20-116, the defendants in *Kai Nielsen* argued that they should not be required to pay restitution because the jury did not set the value or amount of property stolen. The court responded,

> The jury returned a verdict of guilt as to count one, which was the C felony of theft. The court heard ample proof to make a determination that the amount initially paid for the stock was twenty five thousand dollars. The court ordered that amount of restitution, and did not include additional interest or damages. A trial judge may direct the payment of restitution to the victim as a condition of probation, pursuant to T.C.A. 40-35-304. This court has held that when restitution is ordered as a condition of probation, the authority to determine the appropriateness and the amount of restitution lies solely with the trial court. . . . The defendants were placed on probation in this cause, and restitution was ordered as a condition of probation. The jury was not required to fix the amount of restitution.

*Id*., slip op. at 5-6.

In *Charles Chesteen*, the defendant pleaded guilty to Class C theft and official misconduct. The court imposed an effective six-year incarcerative sentence, along with restitution in the amount of $101,821.73. On appeal, the court modified the manner of service of the sentences and reversed and remanded the restitution determination. *Charles Chesteen*, slip op. at 1, 15. The sentencing court had ordered no restitution for the theft conviction, but it assessed the full amount of $101,821.73 for the official misconduct conviction. "At the outset," the *Charles Chesteen* court noted in its opinion, "we discern errors of law in the trial court's judgment as they relate to the matter of restitution." *Id.*, slip op. at 12. The court continued,

> In the official misconduct conviction, restitution was not available to the trial court in conjunction with a sentence of total confinement. . . . [B]ased on the sentencing law as it existed for crimes committed prior to July 1, 1996, restitution could not be ordered when total confinement was imposed. . . .
>
> In the theft case, the trial court's error is the failure to order restitution. The court was not hampered . . . in ordering both total confinement and restitution. . . . [R]estitution in theft cases is mandated and controlled by a specific provision found in Code section 40-20-116(a).

*Id.*, slip op. at 12-13.

Because the *Charles Chesteen* court modified the defendant's sentence to include probation, restitution then was appropriate for both convictions, and the court remanded with instructions for the sentencing court to establish appropriate amounts of restitution. Concerning restitution in the theft case, the court added the following remarks:

> In determining restitution in the theft case, the trial court should be aware of a distinction between the sanction of levy upon execution provided in Code section 40-20-116(a) and restitution as a condition of probation pursuant to section 40-35-304. . . . [W]e believe that to the extent that the trial court wishes to impose restitution as a condition of probation, whether the restitution itself is authorized by the sentencing act or mandated by section 40-20-116(a), the court must comply with the provisions of the sentencing act . . . relative to the amount being reasonable and based upon the defendant's financial ability. . . . Nevertheless, if this determination leads the court to establish an amount of restitution that is less than the theft victim's pecuniary loss, section 40-20-116(a) contemplates the court establishing the deficiency amount -- that is, the difference between the amount that is ordered as a condition to probation and

-24-

the total amount of the loss. This deficiency amount is subject to collection by execution as in the case of a judgment.

*Id.*, slip op. at 13.

A restitution fact pattern, strikingly similar to the one in this case, arose in *State v. Stacy Jones Reed*, No. 02C01-9602-CC-00060 (Tenn. Crim. App., Jackson, Jan. 2, 1997), *perm. app. denied* (Tenn. 1997). The defendant Reed was indicted for theft over $1,000 but less than $10,000. Reed, however, was convicted on a jury verdict of theft of property over $500 but less than $1,000, with the jury reporting to the trial court that it set value at $550. As part of Reed's alternative sentence, she was required to pay $5,354 in restitution to the victim. *Id.*, slip op. at 2.

On appeal, Reed argued error in the amount of the restitution ordered. The state conceded error. *Id.*, slip op. at 11. The court ruled,

> The jury found the defendant guilty of theft of $550.00. Tenn. Code Ann. § 40-20-116(a) provides that when a felon is convicted of stealing property, a jury must ascertain the value of the stolen property. *See State v. Brenda Bryant*, 775 S.W.2d 1, 4-5 (Tenn. Crim. App. 1988). We therefore modify the sentence imposed to provide that defendant must pay $550.00 in restitution.

*Stacy Jones Reed*, slip op. at 11-12. Restitution, imposed as a condition of probation, we note, was never discussed in *Stacy Jones Reed*. *See also State v. Joe King*, No. M2003-01869-CCA-R3-CD, slip op. at 3 (Tenn. Crim. App., Nashville, Jun. 17, 2004) (defendant questioned trial court's authority to require $1,000 for restitution when jury convicted on lesser-included theft offense in an amount of $500 or less; issue waived as not supported by argument, authorities, or references to the record).

From these cases, we distill that (1) the jury's failure to determine a specific value or amount of property stolen does not foreclose the imposition of restitution as a condition of probation, pursuant to Code section 40-35-304; (2) in theft convictions, the sentencing court may order restitution pursuant to Code section 40-20-116(a) *and* as a condition of probation; and (3) in theft cases not involving restitution as a condition of probation, section 40-20-116(a) restitution may not exceed either the value assessed by the jury or the theft-value range reflected in the jury's verdict. Because, in this case, restitution was imposed solely as a condition of probation, the section 40-35-304(d) considerations about financial resources and future ability to pay determine the amount and method of payment of appropriate restitution. The record in this case, however, contains inadequate findings in this regard for which a remand is required for the trial court to consider and make the required statutory findings.

Our final inquiry is whether any order of restitution in this case is subject to the dictates of the recent United States Supreme Court's decision in *Blakely v. Washington*, ___ U.S.

___, 124 S. Ct. 2531 (2004). Pursuant to *Blakely*, any fact that increases a sentence beyond the "relevant statutory maximum" -- defined by the Court's majority as the maximum sentence that a judge may impose without making any additional findings of fact -- must be submitted and proved to the jury beyond a reasonable doubt or admitted by the defendant. *Id*. at ___, 124 S. Ct. at 2536-37. The *Blakely* Court did not speak in narrow terms that targeted merely the length of an accused's sentence; rather, the Court spoke in broader terms of the power to *punish*: "When a judge inflicts *punishment* that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the *punishment*,' . . . and the judge exceeds his proper authority." *Id*. at ___, 124 S. Ct. at 2537 (emphasis added).

Existing Tennessee case law expressly recognizes, "The purpose of restitution is not only to compensate the victim *but also to punish* and rehabilitate the guilty." *State v. Johnson*, 968 S.W.2d 883, 884 (Tenn. Crim. App. 1997) (emphasis added). Restitution has also been described as "an important tool in the punishment of criminals." *State v. William T. Cowart*, No. 01C01-9508-CC-00251, slip op. at 9 n.5 (Tenn. Crim. App., Nashville, Nov. 22, 1996). More particularly, restitution has been regarded as "a part of the sentencing scheme and in the nature of a penalty for crime," which is not affected by the victim releasing the offender from civil liability. *State v. Jason C. Deyton, Jr.*, No. 234, slip op. at 4 (Tenn. Crim. App., Knoxville, Feb. 2, 1989).

Tennessee's view of restitution ostensibly conflicts with the prevailing view in two federal circuits, *United States v. Behrman*, 235 F.3d 1049 (7th Cir. 2000) (restitution for harm done is a classic civil remedy, not a penalty for a crime; *Apprendi*, therefore, does not affect the calculation of restitution); *United States v. Nichols*, 169 F.3d 1255 (10th Cir. 1999) (purpose of restitution not to punish but to ensure victims are made whole for losses), but it is consistent with the approach taken in two other federal circuits, *United States v. Syme*, 276 F.3d 131 (3d Cir. 2002) (restitution orders made pursuant to criminal convictions are criminal penalties within the meaning of *Apprendi*); *United States v. Bearden*, 274 F.3d 1031 (6th Cir. 2001). The United States Supreme Court, in *Kelly v. Robinson*, 479 U.S. 36, 107 S. Ct. 353 (1986), held that a restitution obligation, imposed as a condition of probation in a state criminal proceeding, was not dischargeable under Chapter 7 of the Bankruptcy Code because, *inter alia*, restitution orders in criminal proceedings focus on the state's interest in rehabilitation and punishment rather than the victim's desire for compensation.

Regardless whether restitution qualifies as punishment, however, we believe that a judicial finding of an amount of restitution does not run afoul of the Due Process or Sixth Amendment guarantees as interpreted in *Blakely*. *Blakely* and its progenitor, *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), specifically targeted increased penalties for crimes *beyond the prescribed statutory maximum* without submission to a jury or admission by a defendant. Neither Code section 40-20-116 nor section 40-35-304 embraces a "statutory maximum" that could be increased by a given finding; that is to say, neither statute specifies a maximum amount of restitution that may be ordered. Accordingly, nothing in *Blakely* appears to reach our restitution scheme or the particular restitution order entered in this case.

For the reasons discussed above, we vacate the order of restitution and remand the matter of restitution to the trial court for the appropriate determinations required under Code section 40-35-304.

## B. Length of Sentence and Manner of Service

The trial court sentenced the defendant Patricia White to a term of four years, which it then suspended in favor of probation. As a Range I offender convicted of a Class C offense, the defendant's sentencing range was three to six years. *See* Tenn. Code Ann. § 40-35-112(a)(3) (2003). The trial court enhanced her sentence based on her leadership role in the commission of the offense, *see id.*, § 40-35-114(3) (2003), the involvement of more than one victim, *see id.*, § 40-35-114(4) (2003), and her abuse of a position of private trust, *see id.*, § 40-35-114(16) (2003).

In our estimation, the decision in *Blakely* requires a presumptive minimum sentence of three years absent any enhancement factors. Each of the enhancement factors found by the trial court fall within the ambit of *Blakely*'s prohibition of sentence enhancement greater than the statutory maximum without jury intervention and determination. *See State v. Steven M. Stinson*, No. E2003-01720-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Knoxville, Jul. 29, 2004) (misapplication of enhancement factors pursuant to *Blakely*). Although the trial court suspended the defendant's sentence and placed her on probation, the length of her original sentence is, nonetheless, momentous because in the event probation is revoked, the original sentence imposed can be effectuated. *See* Tenn. Code Ann. § 40-35-310 (2003). Accordingly, a sentence-length modification to a presumptive minimum three-year sentence is appropriate.[3]

As for the duration of probation imposed in this case, fifteen years, there is no requirement that the duration of the probationary period be identical to the length of the sentence imposed. *See id.* § 40-35-303(c) (2003). The duration of the probation must be at least the length of the statutory minimum sentence, but it can run "up to and including the statutory maximum time for the class of the conviction offense," *id.* § 40-35-303(c) (2003), which is what was ordered in this case. No findings outside of or in addition to the jury's verdict are required before the trial court can set the duration of the probationary period greater than the length of the statutory minimum sentence. We are, therefore, persuaded that *Blakely* does not affect the probationary sentencing in this case.

## III. CONCLUSION

For the foregoing reasons, the conviction of defendant Craig White is reversed, and the charge is dismissed. The defendant Patricia White's conviction for Class C felony theft is

---

[3] The trial court did impose a presumptive minimum two-year sentence for the defendant Craig White's facilitation conviction. *See* Tenn. Code Ann. §§ 39-11-403(b) (2003) (facilitation of commission of a felony is an offense of the class next below the felony facilitated), 40-35-112(a)(4) (2003) (Range I sentence for Class D felony is not less than two nor more than four years).

affirmed, but the length of her sentence is modified to a presumptive minimum of three years. Finally, the issue of restitution is remanded to the trial court for appropriate findings.


_____

JAMES CURWOOD WITT, JR., JUDGE